Filed 11/20/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JESS WILLARD MAHON, JR., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent. | D074877<br><br><br><br>(Super. Ct. No. 37-2015-00014540-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge. Affirmed.

Krause Kalfayan Benink & Slavens, Vincent D. Slavens, Eric J. Benink; Huskinson Brown & Heidenreich, Paul E. Heidenreich and David W.T. Brown for Plaintiffs and Appellants.

Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney, and Meghan Ashley Wharton, Deputy City Attorney, for Defendant and Respondent.

I.

INTRODUCTION

Proposition 218, the Right to Vote on Taxes Act, generally requires that local governments obtain voter approval prior to imposing taxes, as its name suggests. (Prop. 218, § 3, approved Nov. 5, 1996; Cal. Const., art. 13C, § 2.) Plaintiffs Jess Willard Mahon, Jr. and Allan Randall brought this certified class action against the City of San Diego (City) claiming that the City violated Proposition 218 by imposing an illegal tax to fund the City's undergrounding[1] program.

In the operative complaint, plaintiffs contend that the City violated Proposition 218 through the adoption of an ordinance that amended a franchise agreement between the City and the San Diego Gas & Electric Company (SDG&E). The ordinance provides generally that SDG&E will budget 4.5 percent of its "gross receipts"[2] from the sale of electricity in the City to pay for undergrounding. The ordinance, together with a related memorandum of understanding, further specifies that part of the money to fund the undergrounding budget will be collected by SDG&E through a 3.53 percent surcharge on ratepayers in the City that will be remitted to the City for use on undergrounding (Undergrounding Surcharge). Plaintiffs claim that the surcharge is a tax. Plaintiffs further claim that the surcharge violates Proposition 218 because it was never approved

---

[1]    Undergrounding refers to the process of removing existing overhead electric and communications facilities and placing them underground.

[2]    As discussed in part II.A.5.c, *post*, the term "gross receipts" is defined in the ordinance.

2

by the electorate.  Plaintiffs note that the City has imposed more than 200 million dollars in charges pursuant to the Undergrounding Surcharge during the class period.  Through this action, plaintiffs seek a refund of those amounts, among other forms of relief.

The City filed a motion for summary judgment, which the trial court granted on two independent grounds.  First, the trial court concluded that the Undergrounding Surcharge constitutes compensation for franchise rights and thus is not a tax under *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248 (*Jacks*), which held that "a charge imposed in exchange for franchise rights is a valid fee rather than a tax . . . if the amount of the charge is reasonably related to the value of the franchise." (*Id.* at p. 257.)  Alternatively, the trial court concluded that the Undergrounding Surcharge is a valid regulatory fee and not a tax.

On appeal, plaintiffs contend that the Undergrounding Surcharge is neither a franchise fee nor a regulatory fee, but is instead an illegally imposed tax.  As to the franchise fee issue, plaintiffs' primary contention is that the Undergrounding Surcharge is not a franchise fee under *Jacks* because it does not constitute *compensation* for franchise rights.  Accordingly, plaintiffs maintain that the trial court erred in granting the City's motion for summary judgment.

We conclude that the trial court properly granted the City's motion for summary on the ground that the Undergrounding Surcharge is compensation validly given in

3

exchange for franchise rights under *Jacks* and thus, is not a tax subject to voter approval under Proposition 218. Accordingly, we affirm the judgment.[3]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

    1. *The 1920 Franchise Agreement*

In 1920, the City granted SDG&E[4] an electric franchise for a period of 50 years. The 1920 Franchise Agreement granted SDG&E the " 'franchise and authority to . . . erect and maintain poles, wires, conduits and pipes for wires for transmitting electricity for heat and power purposes along and upon all of the public streets, alleys, highways and public places in [the City of San Diego].' "

    2. *Rule 20A*

In 1965, the Public Utilities Commission (PUC) instituted an investigation with respect to the undergrounding of electric and communications lines. Two years later, as part of this investigation, the PUC, through Decision No. 73078, accepted a commitment by SDG&E to conduct an undergrounding program paid for with SDG&E's funds. The PUC required SDG&E to adopt a new rule regulating the undergrounding that became known as Rule 20A. Rule 20A limited both the locations at which undergrounding

---

[3]     In light of our conclusion, we need not consider the plaintiffs' contention that the trial court erred in determining, in the alternative, that the Undergrounding Surcharge is a regulatory fee rather than a tax.

[4]     At the time, SDG&E was named the San Diego Consolidated Gas and Electric Company. The company changed its name to SDG&E around 1939.

projects could be performed and the types of undergrounding related expenses for which SDG&E could pay.

3. *The 1970 Electric Franchise Agreement (Ordinance 10466)*

a. *Events leading to the 1970 Electric Franchise Agreement*

In April 1969, the City Council adopted a resolution authorizing the City Manager and the City Attorney to commence discussions with SDG&E pertaining to the adoption of a new franchise agreement in light of the impending expiration of the 1920 Franchise Agreement.

The City hired a consulting firm to advise it with respect to the negotiations. In June 1970, the firm prepared a report that analyzed potential franchise terms, among other topics.[5] The report recommended that a new franchise agreement provide that a "franchise payment be established at 2 ½ percent of all gross revenues from customers within the city with no adjustments of any kind;" and that "the revised franchise agreement provide for [an] additional 2 ½ percent, or a total of 4 ½ percent of the utility's electric revenues from San Diego city operations be allocated for undergrounding purposes."

The City Manager submitted a report to the Mayor and the City Council concerning the proposed franchise agreement in July 1970. The report included recommendations as to the term of the franchise agreement, payments to be made by

---

5    The report is more than 60 pages in length and is titled, "Concerning Franchises for the Distribution and Sale of Gas and Electricity." (Some capitalization omitted.)

SDG&E under the proposed agreement, and proposed obligations to be imposed on SDG&E related to undergrounding.

That same month, the City advertised bids for the new electric franchise with proposed terms. The City conducted several rounds of bidding, and engaged in extensive negotiations with SDG&E pertaining to the franchise agreement. During these negotiations, the City adopted a resolution outlining a proposed franchise agreement ordinance for a 50-year term that required that the grantee of the franchise pay the City 3 percent of the grantee's gross receipts for the first 30 years of the franchise.

In October 1970, SDG&E applied to the PUC for an order permitting SDG&E " 'to add to the bills of its customers within the City of San Diego a separately stated surcharge equal to the difference between . . . 1.1% of gross receipts in the case of the electric franchise and the new fee of 3% of gross receipts for each of the franchises.' " The application requested that a surcharge of 1.9 percent ("1.9 Percent 1970 Surcharge") be " 'added as a separate item to bills rendered to such customers.' " The PUC gave its preliminary approval of the 1.9 Percent 1970 Surcharge that same month.[6]

---

[6] In *Jacks*, the Supreme Court described the rationale for the PUC's approval of such surcharges. (See *Jacks*, *supra*, 3 Cal.5th at pp. 263–267.) As the *Jacks* court explained, the Legislature has enacted a series of laws that limit the compensation that general law municipalities may charge for a franchise. (*Id.* at pp. 263–265.) However, these limitations do not apply to charter cities. (*Id.* at p. 265.) Accordingly, "the PUC has concluded that it is not fair or reasonable to allow a utility to recoup from all of its utility customers charges imposed by a jurisdiction whose charges exceed the average amount of charges imposed by other local governments. Therefore, the PUC has established a procedure by which a utility may obtain approval to impose a surcharge on the bills of only those customers within the particular jurisdiction that imposes higher-than-average charges." (*Id.* at pp. 265–266.)

b. *The 1970 Electric Franchise Agreement (Ordinance 10466)*

In December 1970, the City Council enacted Ordinance No. 10466 ("Ordinance 10446" or "1970 Electric Franchise Agreement") granting SDG&E a franchise for distributing electricity in the City. Ordinance 10446, section 2 defined the purpose of the franchise as follows:

> "Section 2. PURPOSE
>
> "The franchise (1) to use, for transmitting and distributing electricity suited for lighting but for use by consumers for any and all lawful purposes other than lighting, all poles, wires, conduits and appurtenances which are now or may hereafter be lawfully placed and maintained in the streets within City under the constitutional franchise[7] of Grantee, (2) to construct, maintain and use in said streets all poles, wires, conduits and appurtenances whenever and wherever the constitutional franchise of Grantee is not now nor shall hereafter be available therefor, necessary to transmit and distribute electricity suited for, and for use by consumers for, any and all lawful purposes, and (3) to utilize said poles, wires, conduits and appurtenances in said streets for transmitting electricity for use outside the boundaries of City for any and all lawful purposes is hereby granted to [SDG&E], its successors and assigns."

Section 3 of the ordinance established a 50-year term for the franchise.

---

The City is a charter city. In the 2001 Memorandum of Understanding (see pt. II.A.5.b, *post*), the City stated that the 1.9 Percent 1970 Surcharge was approved by the PUC in order "to capture the difference between the City Franchise Fee and the average franchise fee within . . . SDG&E service territory."

7    Ordinance 10466, section 1(f) defined "constitutional franchise" as follows: "[T]he right acquired through acceptance by Grantee or its predecessor in estate of the offer contained in the provisions of Section 19 of Article XI of the Constitution of the State of California, as said Section existed prior to its amendment on October 10, 1911."

Prior to 1911, the California Constitution prohibited municipalities from charging franchise fees. (*Jacks*, *supra*, 3 Cal.5th at p. 263.)

7

Ordinance 10466, section 4 is titled "Consideration." Section 4(a) established that SDG&E was required to pay the City 3 percent of its gross receipts each year during the first 30 years of the franchise as follows:

> "Section 4. CONSIDERATION
>
> "(a) The rights and privileges herein granted are upon the express condition that Grantee, as consideration therefor and as compensation for the use of the streets of the City as herein authorized and permitted, shall pay each year to City in lawful money of the United States, a sum equal to three per[ ]cent (3%) of Grantee's gross receipts[8] during the pre[ ]ceding calendar year, or a fractional year, commencing with the date of adoption of this ordinance by the City Council, for the first thirty (30) years of the term of this franchise by the dates, in the manner, and on the conditions as set forth in Section 5[9] hereof."

Ordinance 10466, section 4, subdivisions (b) and (c), outlined the process by which the City and SDG&E would determine the amount to be paid for the remainder of the term and provided in relevant part:

> "(b) For the last twenty (20) years of the term of this franchise Grantee, as consideration and compensation for the rights and privileges herein granted and for the use of the streets of the City as herein authorized and permitted, shall pay each year to City in lawful money of the United States a sum equal to an amount to be determined as set forth below of Grantee's gross receipts during the

---

8    Ordinance 10466, section 1(g) defined "gross receipts" as follows: "All gross operating revenues received by Grantee from the sale of electricity to Grantee's customers with points of service within the corporate limits of the City (including, but not limited to, sales to military reservations with points of service within the City's corporate limits) which are credited in [certain specified accounts], less uncollectible amounts and less any refunds or rebates made by Grantee to such customers pursuant to [PUC] orders or decisions."

9    Ordinance 10466, section 5 specified a payment schedule for SDG&E and established various reporting and auditing requirements.

preceding calendar year, or a fractional year, for the remainder of the term of this franchise by the dates, in the manner and on the conditions as set forth in Section 5 hereof.

"(c) Determination of the amount to be paid as set forth in Section 4(b) above shall be made by good faith negotiation between City and Grantee commencing not less than six (6) months prior to the expiration of the first thirty (30) year period."

The remaining subdivisions in section 4 of Ordinance 10466 outlined the process by which the City and SDG&E would conduct such negotiations and provided that if they were unable to agree as to the amount to be paid for the remaining term, the issue would be resolved by way of arbitration.

Section 9, subdivisions (a) and (b) outlined SDG&E's Undergrounding Obligation (Undergrounding Obligation) under the ordinance, as follows:

"(a) Presently, Grantee is engaged in a program of converting to underground certain of its facilities in accordance with Decision No. 73078[10] of the [PUC]. At this time, said decision requires Grantee to budget prior to the end of each calendar year certain sums of money for said program for the next succeeding year and allocate these sums to undergrounding projects in the various governmental jurisdictions throughout Grantee's entire electric service territory on the basis of the number of electric customers in each governmental jurisdiction. Grantee is willing to increase the amounts of money budgeted for said program and as a portion of the consideration for the granting of the rights and privileges contained in this franchise shall accomplish this in the following manner.

"(b) Grantee shall apply annually to the [PUC] for authority to budget amounts of money for the undergrounding of existing overhead facilities in the City. In its application for calendar year 1971 Grantee shall apply to increase the amounts of money to be

---

10   As noted in part II.A.2, *ante*, Decision No. 73078 is the 1967 PUC decision that established Rule 20A.

9

budgeted for such undergrounding in the City from the amount budgeted for 1970 by an amount equivalent to one-half of one percent (l/2%) of its total system gross receipts for the calendar year preceding the year of application (i.e., 1969) multiplied by the allocation ratio.[11]  Thereafter Grantee shall  increase each year the amount so applied for by one-half percent (1/2%) of its total system gross receipts for the calendar year preceding the year of application multiplied by the allocation ratio until such budgeted amounts of money for undergrounding in the City reach a sum which is equal to four and one-half percent (4 1/2%) of said total system gross receipts multiplied by the allocation ratio.  Thereafter Grantee shall continue to apply to budget an amount of money equal to four and one-half percent (4 1/2%) of said total system gross receipts multiplied by the allocation ratio for such under-grounding conversion." (Ord. 10466, § 9(a), (b).)

Subdivisions (c) and (d) specified circumstances under which SDG&E might have a reduced Undergrounding Obligation:

> "(c) If the amounts so budgeted for any calendar year are not expended in that calendar year or the next two succeeding calendar years following the budgeting thereof because of forces beyond the control of Grantee, then in that event and that event only Grantee may reallocate the unexpended amounts of money, in its discretion, for any other lawful purpose.

---

11    Ordinance 10466, section 1(h) and (i) defined "total system gross receipts," and "allocation ratio" as follows:

> "(h) The phrase 'total system gross receipts' shall mean all gross operating revenues received by Grantee from the sale of electricity to Grantee's customers within its entire service territory which are credited in [certain specified accounts], less uncollectible amounts and less any refunds or rebates made by Grantee to such customers pursuant to [PUC] orders or decisions;

> "(i) The phrase 'allocation ratio' shall, unless and until otherwise modified by the [PUC], mean a numerical ratio determined by the proportion which the number of Grantee's electric customers in the City bears to all of Grantee's electric customers throughout its entire electric service territory."

10

"(d) This section shall not be deemed in any way to be an impairment of City's rights as more particularly set forth in Section 8[12] of this ordinance. Nothing contained herein is intended to prevent Grantee from informing City and the [PUC] of then existing or foreseeable economic conditions or other factors which in the opinion of Grantee make unwise the granting in whole or in part, of the particular annual application." (Ord. 10466, § 9(c), (d).)

Subdivision (e) provided: "This section is intended only to be a measure of a portion of the consideration to be paid by Grantee to City for the rights and privileges granted herein and therefore it does not create or confer any rights or obligations to any[ ]one other than City or Grantee." (Ord. 10466, § 9(e).)

Ordinance 10466 contained numerous other provisions outlining SDG&E's franchise relationship with the City (e.g., Section 6: "Compliance with laws"; Section 7: "Administrative Practices"; Section 14: "Publication Expense"; Section 18: "Performance Bond").

### c. *PUC's approval of the 1.9 Percent 1970 Surcharge*

The PUC gave its final approval of the 1.9 Percent 1970 Surcharge in July 1972. In its decision, the PUC explained that surcharges are necessary to avoid situations where " 'charter cities in the State [e.g. the City] increase franchise fees to gas and electric utility companies in anticipation that the utilities will increase their rates throughout their service territories and recoup these expenses from ratepayers in general law cities and

---

12    Ordinance 10466, section 8 specified certain powers reserved to the City, including the right to exercise its police power to "require the removal or relocation, to either overhead or underground locations, of said poles, wires, conduits and appurtenances thereto at the sole cost and expense of Grantee."

unincorporated territory, thus transferring a large portion of the increased burden of charter city levies to customers of the utility residing outside the charter cities.' "

4. *Implementation of the 1970 Electric Franchise Agreement*

Between 1970 and 2000, undergrounding in the City was severely limited by restrictions placed on SDG&E's use of the Rule 20A funds. Rule 20A restricted the types of streets that could be part of undergrounding projects. Rule 20A also restricted, by voltage carried, the types of lines that could be placed underground. Disputes frequently arose between the City and SDG&E regarding whether a street or line voltage qualified to be placed underground using Rule 20A funds. Additionally, during this time, property owners were generally required to arrange for, and pay the cost of, the lateral conversion of the underground lines, and property owners' failure to do so often caused long delays.

In addition, between 1979 and 2001, through various agreements between the City and SDG&E as well as PUC actions, SDG&E was permitted to reduce its Rule 20A undergrounding budget as provided for in section 9 of Ordinance 10466 far below the level specified in the ordinance.

5. *The 2002 Electric Franchise Amendment* (*Ordinance O-19030*)

a. *Negotiations pertaining to the 2002 Electric Franchise Amendment*

Between mid-1999 and early 2002, the City and SDG&E engaged in negotiations to reach an agreement that would establish SDG&E's obligations for the remaining 20 years of the 1970 Electric Franchise Agreement. The City hired a consulting firm that

12

advised the City throughout the course of the negotiations. The firm provided the City with an extensive memorandum covering numerous topics related to the negotiations.

SDG&E proposed a reduction in its obligation to pay the City 3 percent of gross receipts in exchange for increased spending by SDG&E on undergrounding. The City, in turn, proposed: increasing the 3 percent payment obligation to 6 percent; revising the Undergrounding Obligation to require that SDG&E expend, rather than merely allocate, 4.5 percent of gross receipts on undergrounding; and requiring that SDG&E's shareholders absorb the increased costs associated with such changes.

The City also desired to remove restrictions on funds used for undergrounding. However, during the negotiations, through its participation in proceedings before the PUC, the City learned that the PUC's restrictions on SDG&E's use of Rule 20A funds would, for the most part, remain in place. Therefore, SDG&E would be unable to expend Rule 20A funds in the manner that the City thought was in the best interest of its residents.

Representatives from the City and SDG&E met face to face more than 30 times throughout the course of the negotiations. SDG&E and the City exchanged numerous draft ordinances and memoranda of understanding related to the proposed amendment of the 1970 Electric Franchise Agreement during these negotiations.

b. *The December 2001 Memorandum of Understanding*

In December 2001, the City and SDG&E entered into a Memorandum of Understanding (2001 MOU) that outlined the terms of an amendment to the 1970 Electric

13

Franchise Agreement and SDG&E's revised Undergrounding Obligation, including the enactment of the Undergrounding Surcharge.

Section 2 of the 2001 MOU summarized the Undergrounding Surcharge as follows:

> "In order to meet the City's objectives of increasing the current amount of undergrounding being done in the City above what was previously agreed to by [SDG&E and the City] and satisfy any obligation of SDG&E to apply to the [PUC] to underground electric facilities in an amount provided in Section 9 of the [1970 Electric Franchise Agreement] and changing the definition of [g]ross [r]eceipts,[13] SDG&E will support the City by submitting an Advice Letter to the [PUC] asking to increase the [1.9 Percent 1970 Surcharge] on the residents of the City from 1.9% to 5.78% conditioned upon the City using 3.53% of the [additional surcharge] solely for undergrounding projects within its geographic territory in conformance with the terms herein with the remainder of .35% to be an increase to the [1.9 Percent 1970 Surcharge]."

Section 6 of the 2001 MOU states, "The franchise fee[ ] percentage[ ] for . . . the . . . [e]lectric [f]ranchise[ ] shall remain at 3% for the remaining term[ ] of the [f]ranchise[ ]." Section 8 specified that "[a]ll surcharge revenues will be paid directly to the City . . . ."

Finally, section 16 of the 2001 MOU provided that, if the PUC were to fail to timely approve the surcharge increase, the City and SDG&E would either resume negotiations or submit the matter to arbitration:

---

13    As explained in part II.A.5.c, *post*, in the 2002 Electric Franchise Amendment, the City and SDG&E agreed to change the definition of "gross receipts" in the 1970 Electric Franchise Agreement to include SDG&E's revenues obtained from PUC approved surcharges in the City.

14

"In the event the [PUC] does not approve the Advice Letter filing in a manner acceptable to each [p]arty or does not act on the Advice Letter filing on or before December 31, 2002, the [p]arties will mutually agree to either extend the negotiating period, or in the alternative either [p]arty can require arbitration as provided in Section 4 of the Franchises. The [p]arties agree that SDG&E shall continue payment of [f]ranchise [f]ees in the same amount and manner as calculated and paid in calendar year 2000 until the effective date of such acceptable [PUC] approval or other finally agreed upon negotiated or arbitrated decision."

c. *The 2002 Electric Franchise Amendment (Ordinance O-19030)*

In January 2002, the City Council enacted Ordinance No. O-19030 ("Ordinance O-19030" or "2002 Electric Franchise Amendment"), amending the 1970 Electric Franchise Agreement.[14] The introductory portion of Ordinance O-19030 summarized the key provisions of the 1970 Electric Franchise Agreement and explained that the City and SDG&E had reached an agreement to amend that agreement. The introduction summarized the relevant key provisions of the amendment as follows:

"WHEREAS, [SDG&E and the City] have agreed that, subject to [PUC] approval, gross receipts as defined in Section 1 of the [1970 Electric Franchise Agreement] shall include revenues from [the 1.9 Percent 1970 Surcharge], as well as other statutory or [PUC] approved surcharges solely [*sic*] on the City ratepayers and as a result of such changes, the [1.9 Percent 1970 Surcharge] will be increased by .35%; and

"WHEREAS, [SDG&E and the City] have agreed that the funding for the obligations of SDG&E to underground its facilities as set forth in Section 9 . . . of the [1970 Electric Franchise Agreement] shall be structured as follows after the effective date of this Ordinance:

---

14    We refer to the 1970 Electric Franchise Agreement, as amended by the 2002 Electric Franchise Amendment, as the "Electric Franchise."

15

"(a) collecting a portion of the funds from ratepayers in base rates (1.15%) approved by the [PUC];

"(b) with the remainder to be collected from ratepayers in the City through a [PUC] approved surcharge (3.53%) which will be paid directly to the City, as set forth herein;

"(c) for a total obligation of four and one-half percent (4.5%) of gross receipts, plus .18% for 1/19th of 2001 allocation (which amount is included within the 3.53%)."[15]

Ordinance O-19030, section 1 revised the definition of "gross receipts" in section 1(g) of the 1970 Electric Franchise Agreement in the manner outlined in the introductory section of Ordinance O-19030.

Section 2 of Ordinance O-19030 amended section 4 of the 1970 Electric Franchise Agreement by deleting subdivisions 4(b) through (h), all of which pertained to the determination of SDG&E's payment obligation in the final 20 years of the franchise, and replacing those subdivisions with a new subdivision 4(b) that provides in relevant part:

"(b) For the remaining years of the term of the [1970 Electric Franchise Agreement], Grantee, as consideration and compensation for the rights and privileges herein granted and for the use of the streets of the City as herein authorized and permitted, shall pay each year to City in lawful money of the United States, a sum equal to three percent (3%) of Grantee's gross receipts during the preceding calendar year, or a fractional year, commencing with the effective date of this ordinance adopted by the City Council, for the remaining years of the term of this franchise by the dates, in the manner, and on

---

15    Stated differently, the City and SDG&E agreed that SDG&E would meet its obligation to budget 4.5% of its gross receipts for undergrounding by: 1) budgeting 1.15% of its gross receipts from its base rates; and 2) collecting the balance from its ratepayers in the City as a 3.35% surcharge (4.5% - 1.15%).  The 2002 Electric Franchise Amendment also included an additional 0.18% surcharge (a one year payment of 3.35% spread over the remaining 19 years of the franchise) to recover surcharges uncollected in 2001, resulting in a total surcharge on SDG&E ratepayers for undergrounding of 3.53%.

the conditions as set forth in Section 5[16] hereof."  (Ord. O-19030, § 2.)

Ordinance O-19030, section 3 adopted the changes to SDG&E's Undergrounding Obligation referenced in the introduction to the ordinance and the 2001 MOU by amending sections 9(b), and (c) of the 1970 Electric Franchise Agreement to enact the Undergrounding Surcharge by stating:

"(b) Grantee shall apply to the [PUC] for authority to budget amounts of money for the undergrounding of existing overhead facilities in the City to reach a sum which is equal to four and one-half percent (4.5%) of said gross receipts as defined in Section 1(g), with 1.15 % of gross receipts to be included within the base rates, and 3.88 % to be collected through an increase in the current [1.9 percent 1970 Surcharge] to the ratepayers in the City.  Of the 3.88%, 3.53% will be allocated to undergrounding projects and .35% will be an increase to the original [1.9 Percent 1970 Surcharge].[17]

"(c) Until and unless Grantor elects to assume the obligation, Grantee shall be responsible, to the extent within the reasonable control of Grantee, for ensuring that all funds allocated for any calendar year, are expended by the end of the succeeding calendar year, provided that Grantee and Grantor may agree in writing otherwise."  (Ord. O-19030, § 3.)

    d.  *The PUC's approval of the 3.88 Percent 2002 Surcharge*

The PUC approved the additional 3.88 Percent 2002 Surcharge, bringing the total surcharge to 5.78 percent.

---

16    As noted in footnote 9, *ante*, Ordinance 10466, section 5 outlined SDG&E's payment schedule.

17    We refer to the 3.88 percent surcharge as the "3.88 Percent 2002 Surcharge."  The Undergrounding Surcharge is a component of the 3.88 Percent 2002 Surcharge.

B. *Procedural background*

    1. *The initial complaint, first amended complaint and the trial court's class certification order*

In April 2015, Mahon filed the initial putative class action complaint in this matter. In his complaint, Mahon claimed that the entire 3.88 Percent 2002 Surcharge, as well as a gas franchise surcharge contained in a separate franchise agreement between the City and SDG&E, were illegal taxes. Mahon, Allan Randall, and Randy Oathes filed a first amended complaint in May 2015, which challenged the 3.88 Percent 2002 Surcharge and the gas franchise surcharge challenged in the initial complaint.[18] The trial court certified a class in October 2016 consisting of all SDG&E customers in the City who paid for gas and / or electricity service during the class period (i.e., from March 9, 2014 through entry of a final judgment).[19]

---

[18]    Oathes is no longer a plaintiff.

[19]    The class certification order states in relevant part:

    "1. The class is certified and defined as:

    All San Diego Gas & Electric Co. customers (including natural persons, organizations, corporations, associations, or any other legal entity of any kind) who paid for gas and/or electric utility service at service locations within the boundaries of the City of San Diego, California during the Class Period. Expressly excluded from the class definition are government agency utility customers and any judicial officers assigned to this action. (the 'Class').

    "[¶] . . . [¶]

    "3. The 'Class Period' is the period on and after March 9, 2014 through and including the date of entry of final judgment in this action."

2. *The trial court's stay of all proceedings pending the issuance of* Jacks

In November 2016, the City moved to continue the matter pending the Supreme Court's issuing of its opinion in *Jacks*. The trial court stayed the matter for a period of 90 days. The Supreme Court issued its opinion in *Jacks* in June 2017, and the trial court lifted its stay of the proceedings the following month.[20]

3. *The parties' stipulation to permit the filing of a second amended complaint and to modify the class*

Shortly after the Supreme Court issued its opinion in *Jacks*, the parties entered into a stipulation to permit the plaintiffs to file an amended complaint and to modify the class definition. The stipulation explained that "following the issuance of the California Supreme Court's ruling in *Jacks* . . . , the [p]arties met and conferred and agreed to narrow the issues presented in this action by way of an amended complaint." The parties agreed that plaintiffs would be granted leave to file a second amended complaint and that the order certifying the class would be modified to exclude SDG&E gas customers from the class definition. The trial court subsequently entered an order granting plaintiffs leave to file a second amended complaint, and modifying the class definition in a manner consistent with the parties' stipulation.

---

20 Although it is not entirely clear from the record, it appears that the trial court continued to stay the proceedings beyond the initial 90-day period pending the Supreme Court's issuance of *Jacks*.

4. *The operative second amended complaint*

Plaintiffs filed the operative second amended class action complaint in September 2017. In their complaint, plaintiffs explained that their causes of action are premised on the City's 2002 adoption of "Ordinance O-19030 which imposed, and continues to impose, a 3.53% undergrounding surcharge ('Undergrounding Surcharge') upon [SDG&E] customers with electric utility service at locations within the City's boundaries." Plaintiffs alleged that the City's imposition of the Undergrounding Surcharge on SDG&E customers within the City is "an illegal tax enacted by the City and imposed upon utility users in violation of Proposition 218."

As relevant to the franchise fee issue raised in this appeal, plaintiffs alleged that "[t]he Undergrounding Surcharge is not a franchise fee and there is no nexus between the Undergrounding Surcharge and the value of the [f]ranchise the City granted to SDG&E."

The second amended class action complaint contains four causes of action styled as: "Violation of Proposition 218," "Declaratory Relief," "Injunctive Relief," and "Tax Refund." Plaintiffs sought a declaration that the City violated Proposition 218 and that the Undergrounding Surcharge was an unconstitutional tax. In addition, plaintiffs requested an injunction to prevent the City from continuing to collect the Undergrounding Surcharge, and to be awarded a refund of the taxes illegally imposed through the Undergrounding Surcharge.[21]

---

[21] Plaintiffs claimed that "[d]uring the Class Period to date, the City has imposed upon Plaintiffs and Class members estimated Undergrounding Surcharges totaling more than $205,000,000."

20

5. *The City's motion for summary judgment or, in the alternative, summary adjudication*

The City filed a motion for summary judgment or, in the alternative, summary adjudication in February 2018.[22]

As a threshold argument, the City argued that plaintiffs lacked standing to bring their challenge.[23] On the merits, the City argued that plaintiffs could not establish that the Undergrounding Surcharge[24] was an illegal tax, both because it was lawful

---

[22] Plaintiffs filed a cross-motion for summary judgment. As noted in footnote 30, *post*, in its order granting the City's motion for summary judgment, the trial court ruled that plaintiffs' motion for summary judgment was moot.

[23] In its order granting the City's motion for summary judgment, the trial court rejected the City's contention that plaintiffs lacked standing. The City does not raise its standing argument as an alternative ground for affirmance on appeal.

[24] To be precise, the City argued that SDG&E's "UG [Undergrounding] *Obligation*," was lawful consideration offered in exchange for franchise rights and a legitimate regulatory fee. (Italics added.) In its briefing, the City drew a distinction between the Undergrounding *Surcharge* (i.e., the 3.53 percent surcharge on ratepayers' bills) and SDG&E'S "UG [Undergrounding] *Obligation*," to budget 4.5 percent of its gross receipts for undergrounding. (Italics added.)

The distinction between the Undergrounding Obligation and the Undergrounding Surcharge was important in presenting the City's standing argument. Specifically, the City argued that plaintiffs lacked standing to challenge the Undergrounding *Surcharge*, because, according to the City, ratepayers such as plaintiffs paid the Undergrounding Surcharge to *SDG&E* and not to the *City*. In addition, the City argued that plaintiffs lacked standing to challenge SDG&E's [Undergrounding] *Obligation* because the "fact that SDG&E passes on the burden and expense of the UG [Undergrounding] Obligation to the ratepayers is not sufficient to make the ratepayers the payers of the UG [Undergrounding] Obligation to the City." However, as noted in footnote 23, *ante*, the trial court rejected the City's standing argument, and the City does not raise a standing argument on appeal.

In addition, the distinction between the Undergrounding *Obligation* and the Undergrounding *Surcharge* was relevant to the City's other alternative contention that, if the trial court were to determine that the Undergrounding *Obligation* was a tax, it was a

21

consideration paid in exchange for franchise rights and because it was a legitimate

regulatory fee.

With respect to the former argument, the City argued that the Undergrounding

Surcharge constituted compensation for franchise rights and therefore was not a tax under

*Jacks*:

> "The Court in *Jacks* ruled that the surcharge revenue collected by
> [the utility] and then paid over to [the municipality] is an item of
> compensation that [the utility] pays to [the municipality] in exchange
> for the [f]ranchise [r]ights. *Jacks*, [*supra*,] 3 Cal.5th at 269 (noting
> that the surcharge revenue 'is a payment made in exchange for a
> property interest that is needed to provide electricity to City
> residents'). Similarly, the surcharge revenue collected by SDG&E
> and then paid over to the City to satisfy the UG [Undergrounding]
> Obligation is an item of compensation that SDG&E pays to the City
> in exchange for the Franchise Rights."

The City argued further:

> "All consideration that [a local government entity] receives from a
> [u]tility in exchange for the [f]ranchise [r]ights comes under the
> definition of 'compensation' or 'franchise fee' as those term are used
> in *Jacks*, [*supra*,] 3 Cal.5th at 254, 267 (holding that all '***sums*** paid
> for the right to use a jurisdiction's rights-of-way are fees rather than

---

lawful tax, because the Undergrounding *Obligation* was initially imposed in 1970, prior
to the passage of Proposition 218, and no "rate increase occurred," with the enactment of
the Undergrounding *Surcharge* in 2002. This distinction was also relevant to the City's
arguments with respect to the City's contention that SDG&E's Undergrounding
Obligation is a valid regulatory fee.

The City continues to use this terminology in its briefing on appeal in arguing that
the "UG [Undergrounding] *Obligation*" is lawful. (Italics added.) Since we need not
address the City's standing argument or its alternative contentions with respect to either
the regulatory fee issue or the timing of the adoption of the Undergrounding *Obligation*,
and given that the plaintiffs have argued that the Undergrounding *Surcharge* is unlawful,
for purposes of clarity, we refer to the City's arguments as to the lawfulness of the "UG
[Undergrounding] Obligation" both in the trial court and on appeal, as pertaining to the
Undergrounding *Surcharge*, which is a component of the Undergrounding Obligation
contained in section 9 of the Electric Franchise.

taxes') (emphasis added); . . . .  Also, if [p]laintiffs argument is accepted, then the only consideration SDG&E pledges to the City is the 3% Payment Obligation, and SDG&E could refuse to perform every other obligation set forth in the Electric Franchise and still possess the grant of the [f]ranchise [r]ights.  This interpretation of the Electric Franchise is not only nonsensical, but contrary to the express language of the Electric Franchise stating that all SDG&E obligations set forth in the Electric Franchise are given in exchange for the [f]ranchise [r]ights."

The City also argued that the franchise compensation that SDG&E pays the City does not exceed the value of the franchise rights at the time that the City and SDG&E entered into the 2002 Electric Franchise Amendment.  The City argued in relevant part, "[I]t is undisputed that from mid-1999 through 2001, the City and SDG&E engaged in good faith arm's length negotiations resulting in the [2002] Electric Franchise Amendment.  [Citations.]"  After describing the evidence of such negotiations, the City contended that "[t]he City and SDG&E engaged in the type of negotiations that the *Jacks* [c]ourt considered reflective of the market value of the [f]ranchise [r]ights," and maintained that "[p]laintiffs can bring forth no admissible evidence disproving the City's showing on this point."  The City also argued that the reasonableness of the value of the franchise compensation provisions in the 2002 Electric Franchise Amendment was further demonstrated by the fact that the final compensation provisions in the 2002 Electric Franchise Amendment were similar to the compensation recommended by the City's consultants.

The City supported its motion with numerous documents detailing the history of the relationship between SDG&E and the City.  The documents included exhibits containing the relevant City ordinances and related documents; declarations and

23

deposition testimony pertaining to the negotiations between the City and SDG&E; declarations and deposition testimony pertaining to the implementation of the City's undergrounding program; documents from the City's consultants; and PUC decisions and related documents.[25]

6. *Plaintiffs' opposition*

Plaintiffs filed an opposition to the City's motion for summary judgment or adjudication. In their opposition, plaintiffs argued that the "[Undergrounding] Surcharge is not a franchise fee." (Boldface & some capitalization omitted.) In support of this argument, plaintiffs drew a distinction between *consideration* for franchise rights and *compensation* for franchise rights. Plaintiffs maintained that "nothing in *Jacks* suggests that any form of '*consideration*' in a franchise agreement is '*compensation*' for use of public property and not a tax." (Boldface omitted; italics added.) Plaintiffs argued that the only "compensation SDG&E pays to the City for use of streets," is the 3 percent of gross receipts payment obligation contained in the Electric Franchise. (Boldface omitted.) Plaintiffs also noted that while the 3 percent obligation is referred to as a "franchise fee" and "compensation" in Ordinance O-19030, section 9 of the Electric Franchise refers to SDG&E's "obligation to budget for undergrounding," as " 'consideration,' " and section 9 does not use the term "compensation."

---

[25]    During the summary judgment proceedings, the City requested that the trial court take judicial notice of various City ordinances, resolutions and other provisions of the City's law.

Plaintiffs also argued that interpreting SDG&E's Undergrounding Obligation under section 9 of the Electric Franchise as *compensation* under *Jacks* would be inconsistent with City Charter provisions related to franchise ordinances and the use of franchise revenues. In addition, plaintiffs maintained that the conclusion that the Undergrounding Surcharge is not a franchise fee was supported by the fact that, according to plaintiffs, the purpose of the surcharge was to fund the undergrounding program rather than "compensate" the City for the franchise. Finally, plaintiffs claimed that the legislative history of the 2002 Electric Franchise Amendment further demonstrated that the Undergrounding Surcharge was not a valid franchise fee.[26]

Plaintiffs' opposition did not address the City's argument that the franchise compensation that SDG&E pays to the City does not exceed the reasonable value of the franchise rights, other than to assert that the City had "offered no evidence" on this issue.

Plaintiffs supported their opposition with various exhibits, including deposition testimony from City employees and consultants, discovery responses and documents related to the enactment of Ordinance O-19030.

---

[26] Plaintiffs reiterate these arguments on appeal. Accordingly, we describe in detail plaintiffs' arguments with respect to the City Charter, the purpose of the Undergrounding Surcharge and the legislative history of the 2002 Electric Franchise Amendment in part III.D.1.a–c, *post.*

25

7. *The trial court's ruling*

After further briefing, and a hearing, the trial court granted the City's motion for summary judgment in August 2018.[27] In its order, the trial court concluded that the Undergrounding Surcharge is not a tax subject to voter approval for two independent reasons. First, the trial court concluded that the Undergrounding Surcharge is a valid franchise fee under *Jacks* and therefore, is not a tax. In reaching this conclusion, the trial court interpreted Ordinance O-19030, and noted that it expressly provided that SDG&E's allocation of funds for undergrounding as mandated in the ordinance constituted a "portion of the consideration," for the franchise.

The court also ruled that, while the City may not charge a franchise fee that exceeds the reasonable value of the franchise rights, the *Jacks* court did not narrowly circumscribe how a franchise fee is to be "calculated and charged." Accordingly, the trial court ruled that SDG&E's obligation to *allocate* funds for undergrounding in Ordinance O-19030 "may properly constitute compensation," under *Jacks*, even if such obligation did not constitute "actual payment." In addition, consistent with its conclusion that *Jacks* does not circumscribe "how" a franchise fee is "calculated and charged," the trial court also rejected plaintiffs' attribution of legal significance to the fact that Ordinance O-19030 in Section 9 referred to the Undergrounding Obligation as "consideration" and

---

[27] In its order, the trial court granted the City's request for judicial notice and overruled nearly all of the parties' evidentiary objections. We discuss plaintiffs' claim that the trial court erred in sustaining the City's objection to plaintiffs lodging a portion of the legislative history pertaining to the adoption of Ordinance O-19030 in footnote 51, *post*.

26

referred to the 3 percent payment of gross receipts in Section 4 as "compensation." The trial court determined that there is "no legal difference between the terms consideration and compensation," for purposes of determining whether the Undergrounding Surcharge was a valid franchise fee.

The trial court also ruled that plaintiffs had not contended that the compensation specified in Ordinance O-19030 exceeded the reasonable value of the franchise. The trial court reasoned:

> "The Court in *Jacks* recognized 'that determining the value of a franchise may present difficulties.' (*Jacks*, *supra*, 3 Cal.5th at 269.) 'Where a utility has an incentive to negotiate a lower fee, the negotiated fee may reflect the value of the franchise rights, just as the negotiated rent paid by the lessor [*sic*] of a publicly owned building reflects its market value, despite the fact that a different lessor [*sic*] might have negotiated a different rental rate.' (*Id*. at 269–270.)[28] If there is an absence of 'bona fide negotiations,' or in addition to such negotiations, 'an agency may look to other indicia of value to establish a reasonable value of franchise rights.' (*Id*. at 270.) Plaintiffs do not dispute that bona fide negotiations took place or that the value of the compensation in Ordinance No. 10466 or Ordinance O-19030 exceed[s] the reasonable value of the franchise rights.[29] Plaintiffs merely assert it is not compensation."

In the alternative, the trial court concluded that the Undergrounding Surcharge is a regulatory fee.

---

28    We infer from the context that the *Jacks* court intended these references to "lessor," to instead be, "lessee."

29    By this sentence, we understand the court to have meant that plaintiffs did not *dispute* that bona fide negotiations had taken place and that plaintiffs did not *contend* that the value of the compensation in Ordinance 10466 or Ordinance O-19030 exceeded the reasonable value of the franchise rights.

Having concluded that the City had demonstrated as a matter of law that the Undergrounding Surcharge is not a tax, the trial court granted the City's motion for summary judgment.[30]

The trial court entered a judgment in favor of the City in August 2018.

8. *The appeal*

Plaintiffs timely appealed from the judgment.[31]

---

[30] In its ruling, the trial court noted that the plaintiffs' motion for summary judgment was moot in light of its ruling granting the City's motion for summary judgment.

[31] While this appeal was pending, plaintiffs filed a motion for judicial notice requesting that this court take judicial notice of several documents.

We grant the plaintiffs' unopposed request for judicial notice of the ordinance containing the franchise agreement at issue in *Jacks* and numerous documents of which the trial court in this case took judicial notice. (See Evid. Code, §§ 459, subd. (a) [stating that "[t]he reviewing court shall take judicial notice of . . . each matter properly noticed by the trial court," and providing that "[t]he reviewing court may take judicial notice of any matter specified in [Evidence Code] Section 452"]; 452, subd. (b) [permitting the taking of judicial notice of "legislative enactments issued by . . . any public entity in the United States"].) We also grant the plaintiffs' unopposed request for judicial notice of two additional documents (the ordinance containing SDG&E's *gas* franchise and a City Manager's report related to the adoption of Ordinance O-19030) that are contained in the record in this case. (See Evid. Code § 452, subd. (b) [legislative enactments]; *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 7, fn. 2 [taking judicial notice of city manager's memorandum recommending resolution's adoption "as legislative history reflecting on the purposes of the enactment"].)

III.

DISCUSSION

*The trial court properly granted the City's motion for summary judgment
on the ground that the Undergrounding Surcharge is compensation validly
given in exchange for franchise rights under* Jacks *and is therefore
not a tax subject to voter approval under Proposition 218*

Plaintiffs claim that the trial court erred in granting summary judgment to the City on the ground that the Undergrounding Surcharge is compensation validly given in exchange for franchise rights under *Jacks* and is therefore not a tax subject to voter approval pursuant to Proposition 218.

A. *The law governing summary judgment and the applicable standard of review*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143.)

29

As applied to this case, the City was entitled to summary judgment if it demonstrated that the plaintiffs could not establish that "the [U]ndergounding [S]urcharge is a tax that was not approved by [the] voters."[32]  (Accord *Jacks*, *supra*, 3 Cal.5th at p. 267 ["Whether a charge is a tax . . . 'is a question of law for the appellate courts to decide on independent review of the facts' "].)  We independently review the trial court's determination that the City was entitled to judgment as a matter of law because the City successfully demonstrated that the plaintiffs could not establish that the Undergrounding Surcharge is a tax under Proposition 218.

B.  *Proposition 218*

"In 1996, state voters approved Proposition 218 . . . ." (*Jacks*, *supra*, 3 Cal.5th at p. 259.)  As relevant to this case, "Proposition 218 amended the Constitution to add voter approval requirements for general and special taxes . . . (Cal. Const., art. XIII C, §§ 1, 2.)"  (*Ibid.*)

Proposition 218 provided in relevant part:

"SECTION 1.  Definitions.  As used in this article:

"(a) 'General tax' means any tax imposed for general governmental purposes.

"[¶] . . . [¶]

---

32    We quote here from the plaintiffs' brief summarizing an essential element of each of their four causes of action in the operative second amended class action complaint.  As noted in part II.B.4, *ante*, those causes of action are styled as "Violation of Proposition 218," "Declaratory Relief," "Injunctive Relief," and "Tax Refund."

"(d) 'Special tax' means any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund."

"SEC. 2. Local Government Tax Limitation. Notwithstanding any other provision of this Constitution:

"[¶] . . . [¶]

"(b) No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. . . .

"[¶] . . . [¶]

"(d) No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote."  (Prop. 218, § 3, approved Nov. 5, 1996).

Proposition 218, section 5 provides, "The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent."

"Proposition 218 did not define the term " 'tax.' "  (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 11.)  However, in *Jacks*, as described below, the California Supreme Court considered "whether [a] surcharge [in a utility franchise agreement] [was] a tax subject to Proposition 218's voter approval requirement, or a fee that may be imposed by [a municipality] without voter consent."  (*Jacks*, *supra*, 3 Cal.5th at p. 257.)

C.  Jacks

In *Jacks*, a municipality and a utility entered into a franchise agreement to include a charge of 2 percent of the utility's gross annual receipts from the sale of electricity

31

within the municipality.  (*Jacks*, *supra*, 3 Cal.5th at p. 255.)[33]  Pursuant to the

agreement, half of the 2 percent charge was to be collected from the utility itself, which

the utility could recover in its electricity rates.  (*Ibid*.)  The other half of the 2 percent

charge was to be collected from the utility's customers through a separately billed

surcharge.  (*Ibid*.)  The *Jacks* plaintiffs claimed that the separately billed 1 percent

surcharge was a *tax* subject to Proposition 218.  (*Id.* at p. 254.)  The municipality

contended that the surcharge was a valid franchise fee for the use of the municipality's

property in connection with the delivery of electricity and therefore was not subject to

Proposition 218 voter approval requirements.  (*Ibid.*)[34]

After considering the intersection of the law governing initiatives requiring voter

approval of taxes with the law governing franchise fees, the *Jacks* court "h[e]ld that a

_____

[33]    The *Jacks* court noted that the franchise agreement at issue in that case was the
most recent in "a series of franchise agreements granting [the utility] the privilege to
construct and use equipment along, over, and under the [municipality's] streets to
distribute electricity."  (*Jacks*, *supra*, 3 Cal.5th at p. 254.)  The *Jacks* court explained that,
"A utility franchise is a privilege to use public streets or rights-of-way in connection with
the utility's provision of services to residents within the governmental entity's
jurisdiction."  (*Id.* at p. 254, fn. 1.)

[34]    The *Jacks* court noted that "in 2010, after the charge at issue in this case was
adopted, state voters approved Proposition 26," which amended the Constitution to define
the word "tax."  (*Jacks*, *supra*, 3 Cal.5th at p. 260.)  Proposition 26 specified that for
purposes of voter approval of local taxes, " ' "tax" means any levy, charge, or exaction of
any kind imposed by a local government.' " (*Jacks*, *supra*, at p. 260.)  However, the
*Jacks* court made clear, "no party contends that it applies to the charges in this case,
which were imposed prior to the enactment of Proposition 26."  (*Id.* at p. 260, fn. 4.)
        The same is true in this case.  The Undergrounding Surcharge was imposed prior
to the enactment of Proposition 26, and plaintiffs do not make any claim premised on
Proposition 26 in the operative second amended complaint.

charge imposed in exchange for franchise rights is a valid fee rather than a tax . . . if the amount of the charge is reasonably related to the value of the franchise." (*Jacks*, *supra*, 3 Cal.5th at p. 257.)[35]  The *Jacks* court emphasized that its holding was premised on the notion that a bargained for "exchange" (*id.* at p. 267) is the hallmark of a franchise fee rather than a tax:

> "[A] franchise is a form of property, and a franchise fee is the price paid for the franchise.  Moreover, historically, franchise fees have not been considered taxes, and nothing in Proposition 218 reflects an intention to treat amounts paid in exchange for property interests as taxes.  Finally, like the receipt by a discrete group of a special benefit from the government, the receipt of an interest in public property justifies the imposition of a charge on the recipient to compensate the public for the value received.  Therefore, sums paid for the right to use a jurisdiction's rights-of-way are fees rather than taxes.  But as explained below, to constitute compensation for the value received, the fees must reflect a reasonable estimate of the value of the franchise." (*Ibid.*)

In reaching this conclusion, the *Jacks* court specifically rejected the plaintiffs' contention that the surcharge was not a franchise fee because the utility's *ratepayers*, rather than the *utility*, paid the surcharge.[36]  (*Jacks*, *supra*, 3 Cal.5th at pp. 268–269.) The *Jacks* court reasoned in part:

---

35    In reaching this conclusion, the *Jacks* court acknowledged that the provisions of Proposition 218 were to be " 'liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.' " (*Jacks*, *supra*, 3 Cal.5th at p. 267.)

36    The *Jacks* court also expressly rejected the *municipality's* argument that it was the utility, rather than its ratepayers, that paid the surcharge.  (See *Jacks*, *supra*, 3 Cal.5th at p. 270 ["The terms of the 1999 agreement belie the contention that [the utility] assumed a burden to pay the surcharge"].)  The *Jacks* court also rejected the municipality's contention that the surcharge resulted from a decision by the utility and the PUC.  (See *id.*

33

"Plaintiffs observe . . . that [the utility's] customers pay the surcharge, but [the utility] receives the franchise rights; therefore, they contend, the ratepayers do not receive any value in exchange for their payment of the charge. . . . [P]ublicly regulated utilities are allowed to recover their costs and expenses by passing them on to their ratepayers. Among the charges included in the rates charged to customers within the [municipality] is the initial 1 percent of gross receipts paid in exchange for franchise rights, yet plaintiffs do not contend that this initial 1 percent is a tax because ratepayers do not receive the franchise rights. The fact that the surcharge is placed on customers' bills pursuant to the franchise agreement rather than a unilateral decision by [the utility] does not alter the substance of the surcharge; like the initial 1 percent charge, it is a payment made in exchange for a property interest that is needed to provide electricity to [the municipality's] residents. Because a publicly regulated utility is a conduit through which government charges are ultimately imposed on ratepayers, we would be placing form over substance if we precluded the [municipality] from establishing that the surcharge bears a reasonable relationship to the value of the property interest it conveyed to [the utility] because the [municipality] expressed in its ordinance what was implicit—that once the PUC gave its approval, [the utility] would place the surcharge on the bills of customers within the [municipality]." (*Ibid.*)

The *Jacks* court acknowledged the prospect that "franchise fees . . . [could] become a vehicle for generating revenue independent of the purpose of the fees." (*Jacks, supra*, 3 Cal.5th at p. 269.) However, rather than guarding against this possibility by concluding that surcharges paid by *ratepayers* are not franchise fees,[37] the *Jacks* court

at p. 271 ["the [municipality] and [the utility] agreed that [the utility] would impose the surcharge on customers and remit the revenues to the [municipality]"].)

[37] In dissent, Justice Chin maintained that the fact that the utility's *customers* were required to pay the surcharge demonstrated that the surcharge was not a franchise fee, but was, in fact, a disguised tax. (*Jacks, supra*, 3 Cal.5th at p. 282 (dis. opn. of Chin, J.) ["Because the Ordinance requires [the utility's] customers to pay for rights and interests the [municipality] has granted to [the utility], the charge does not constitute a 'franchise fee' for purposes of the rule that 'franchise fees [are not] considered taxes.' . . . In reality,

explained that its "reasonable value" requirement provided the appropriate limitation. (See *ibid.* ["To the extent a franchise fee exceeds any reasonable value of the franchise, the excessive portion of the fee does not come within the rationale that justifies the imposition of fees without voter approval"].)

In determining the reasonable value of a franchise, the *Jacks* court provided the following guidance:

> "We recognize that determining the value of a franchise may present difficulties. Unlike the cost of providing a government improvement or program, which may be calculated based on the expense of the personnel and materials used to perform the service or regulation, the value of property may vary greatly, depending on market forces and negotiations. Where a utility has an incentive to negotiate a lower fee, the negotiated fee may reflect the value of the franchise rights, just as the negotiated rent paid by the lessor [*sic*] of a publicly owned building reflects its market value, despite the fact that a different lessor [*sic*] might have negotiated a different rental rate. In the absence of bona fide negotiations, however, or in addition to such negotiations, an agency may look to other indicia of value to establish a reasonable value of franchise rights.

> "In sum, a franchise fee must be based on the value of the franchise conveyed in order to come within the rationale for its imposition without approval of the voters. Its value may be based on bona fide negotiations concerning the property's value, as well as other indicia of worth. Consistent with the principles that govern other fees, we hold that to constitute a valid franchise fee under Proposition 218,

_____

it is just an increase in the [municipality's] user tax, which the [municipality] *calls* a franchise fee"].) This point was the central thesis of Justice Chin's dissent. (See, e.g., *id.* at p. 275 ["The majority cites no support for its conclusion that a charge imposed on and paid by someone who is granted nothing in return is not a tax as to that person so long as *someone else* receives franchise rights for the payment"]; *id.* at p. 281 [stating that the surcharge was not a franchise fee because it "is not a charge that 'the holder of the franchise'—[the utility]— 'undert[ook] to pay' "]; *ibid.* ["The majority observes that 'a franchise fee is the purchase price of the franchise' [citation], but it does not explain how the [surcharge], which the [municipality] has imposed on someone *other than the purchaser* of the franchise, meets this test"].)

35

the amount of the franchise fee must bear a reasonable relationship to the value of the property interests transferred." (*Jacks*, *supra*, 3 Cal.5th at pp. 269–270.)[38]

D. *The Undergrounding Surcharge constitutes a valid charge imposed in exchange for franchise rights under* Jacks *and is therefore not a tax*

Plaintiffs claim that the Undergrounding Surcharge is a tax under *Jacks* because the surcharge does not constitute *compensation* for SDG&E's use of the City's streets. Plaintiffs further contend that, even assuming that the Undergrounding Surcharge is compensation for the use of the City's streets under *Jacks*, the surcharge remains a tax because it "has no relationship to the value of the use of City streets." (Some capitalization omitted.)

    1. *The Undergrounding Surcharge constitutes compensation in exchange for franchise rights under* Jacks

Plaintiffs' primary argument, both in the trial court and on appeal, is that the Undergrounding Surcharge is not *compensation* given in exchange for franchise rights under *Jacks*. While plaintiffs acknowledge that the Undergrounding Surcharge constitutes "*consideration . . .* given [by SDG&E] to induce the City to grant SDG&E the franchise," plaintiffs argue that "not all *consideration* for a franchise is *compensation* for the use of public property." (Boldface & some capitalization omitted; italics added.) In other words, plaintiffs attempt to draw a distinction between *compensation* given for the

---

[38] The *Jacks* court explained that "[t]he litigation below did not address whether the charges bear a reasonable relationship to the value of the property interests." (*Jacks*, *supra*, 3 Cal.5th at p. 254.) The *Jacks* court thus remanded the matter for further proceedings. (*Id*. at p. 274.)

use of public property, which plaintiffs acknowledge *is* a valid franchise fee under *Jacks*,[39] and other *consideration* that a utility provides to induce a municipality to enter into a franchise agreement, which plaintiffs claim does *not* constitute compensation under *Jacks.*[40] Plaintiffs advance this fundamental premise through a series of arguments concerning the text and legislative history of the Electric Franchise, the City's application of the Electric Franchise and City Charter provisions pertaining to franchise revenues, and the purpose of the Undergrounding Surcharge.

The City contends that the plaintiffs' arguments are flawed and based on an "extremely narrow interpretation of *Jacks*." The City maintains that the trial court properly determined that "all items of consideration conveyed and pledged by SDG&E to the City under the terms of the Electric Franchise are compensation for the franchise rights."

As we explain below, we conclude that all consideration that is a "charge" and is given in exchange for franchise rights, constitutes "compensation for the use of government property" as that phrase is used in *Jacks*. (See *Jacks*, *supra*, 3 Cal.5th at p. 254 ["charges that constitute compensation for the use of government property are not

---

39    For example, plaintiffs argue that in order to determine whether the Undergrounding Surcharge is a tax under *Jacks*, we must determine "whether SDG&E agreed to pay the [Undergrounding Surcharge] as 'compensation for use of its streets,' . . . ."

40    Plaintiffs argue, "[T]he sole *compensation* the City agreed to accept for the use of its streets is the 3% franchise fee and . . . the other *consideration* [in the Electric Franchise] is given to induce the City to grant SDG&E the franchise." (Italics added.)

subject to Proposition 218's voter approval requirements"].) In addition, after considering each of plaintiffs' arguments with respect to text, legislative history, application and purpose, we further conclude that the Undergrounding Surcharge constitutes compensation in exchange for franchise rights under *Jacks*, and thus, that the surcharge is not a tax subject to Proposition 218's voter approval requirements.

### a. Plaintiffs' interpretation of Jacks *is unreasonably narrow and is inconsistent with* Jacks*'s central premise*

As discussed above, plaintiffs' arguments on appeal rest largely on the premise that, in determining whether a charge contained in a franchise agreement is a tax under Proposition 218, a court must determine whether the charge is merely "consideration to induce" the granting of the franchise, which, according to plaintiffs, is *not* compensation under *Jacks*. Plaintiffs articulate this theory most clearly in their reply brief in stating the following:

> "While compensation in a contract is certainly consideration, not all consideration is compensation. And all valid consideration serves as an inducement to the counter party's agreement to enter into a contract. [Citation.]

> "Here, the plain language of the franchise ordinances is unequivocal that the 3% fee is the compensation SDG&E agreed to pay to the City for the use of its streets. [Citation.] All other terms and conditions in the franchise, including SDG&E's Rule 20A undergrounding budgets, are valid consideration to induce the City to grant the franchise. SDG&E agreed to suffer prejudice by budgeting additional funds for undergrounding its facilities beyond the amounts mandated by the PUC. [Citation.] But the Rule 20A undergrounding obligation is not compensation for SDG&E's use of

38

its streets.  Rather, it is one of several terms that served to induce the City to grant the franchise."[41]

Yet, there is nothing in *Jacks* that suggests that the Supreme Court drew any distinction between "consideration to induce" and "compensation" in this context, and nothing in *Jacks* indicates that such a distinction has any significance in determining the existence of a tax under Proposition 218.  The *Jacks* court did not even use the word "consideration" in its opinion,[42] and plaintiffs have not offered any rationale for why the *Jacks* court would conclude that monetary *consideration* given to induce the granting of a franchise would *be* considered a tax while "*compensation* for the use of government property" *is not* a tax.  (*Jacks*, *supra*, 3 Cal.5th at p. 254, italics added.)

In addition, many of the examples that plaintiffs provide in their brief on appeal of "consideration" contained in the Electric Franchise that plaintiffs contend are not "compensation" under *Jacks* are also not *monetary*.  For example, plaintiffs refer to SDG&E's promises in the Electric Franchise to regularly report its financials and to

41    Plaintiffs' references to SDG&E's "Rule 20A undergrounding budgets," and the "Rule 20A undergrounding obligation" are puzzling.  Plaintiffs challenge the Undergrounding Surcharge and acknowledge that "projects funded by the surcharge are *not* PUC Rule 20A projects."  (Italics added.)  Nevertheless, we understand plaintiffs' central point, which is repeated throughout their briefing, to be that, while the Undergrounding Surcharge may be *consideration* given by SDG&E to induce the granting of the franchise, it is not *compensation* under *Jacks*.  Or, as plaintiffs put it in the introduction to their opening brief, "This appeal raises a fundamental question:  is *all* consideration in a franchise agreement 'compensation for the use of public property'?"

42    To be precise, the *Jacks* court did not use the word "consideration," in the sense of *contractual* consideration.  It did talk about another court's "consideration" of an issue.  (*Jacks*, *supra*, 3 Cal.5th at p. 269 ["Although *Sinclair Paint*'s consideration of the purposes"].)

comply with the law.  Even assuming, strictly for purposes of this opinion, that these *nonmonetary* forms of consideration do *not* constitute compensation under *Jacks*, such forms of consideration also are not *charges* such that they could conceivably be a tax under Proposition 218.  (See *Jacks*, *supra*, 3 Cal.5th at p. 257 [stating that Proposition 218 was among voter initiatives requiring "voter approval of certain *charges*," and explaining that whether the surcharge "required voter approval hinges on whether it is a valid *charge* under the principles that exclude certain *charges* from voter approval requirements" (italics added)].)

However, there is no support in *Jacks* for the proposition that a utility may promise monetary consideration to induce the granting of a franchise that *is* a charge for purposes of Proposition 218, but is not *compensation* under *Jacks*.[43]  This distinction appears only in plaintiffs' briefing, and not in *Jacks*.  Instead, whether labeled as "consideration to induce," or as "compensation," as the *Jacks* court itself expressly "h[e]ld," any "*charge* imposed in exchange for franchise rights is a valid fee rather than a tax . . . if the amount of the charge is reasonably related to the value of the franchise." (*Jacks*, *supra*, 3 Cal.5th at p. 257, italics added.)

Indeed, the central rationale of *Jacks* strongly supports the conclusion that *any* charge that serves as "consideration to induce" the granting of a franchise also constitutes "compensation" as that term is used in *Jacks*. (*Jacks*, *supra*, 3 Cal.5th at p. 254.)  That is

---

[43]  This is true as long as the amount of consideration promised is reasonably related to the value of the franchise.

40

because, as discussed above, *Jacks*, at its core, is premised on the idea that consideration promised in *exchange* for franchise rights is *not* a tax. The *Jacks* court emphasized this idea repeatedly throughout its opinion. (E.g., *Jacks*, *supra*, 3 Cal.5th at p. 257 ["a charge imposed in *exchange for* franchise rights is a valid fee" (italics added)]; *id.* at p. 262 ["restrictions on taxation do not encompass amounts paid in *exchange* for property interests" (italics added)]; *id.* at p. 267 ["nothing in Proposition 218 reflects an intention to treat amounts paid in *exchange* for property interests as taxes" (italics added)]; *id.* at p. 268 ["The aspect of the transaction that distinguishes the charge from a tax is the receipt of value in *exchange* for the payment" (italics added)].) Whether labeled as consideration given to induce the granting of a franchise or as compensation for the franchise, monetary charges given in *exchange* for a franchise fit comfortably within the *Jacks* court's specification of nontax franchise fees.

*Jacks*'s rooting of its definition of nontax franchise compensation in the notion of an *exchange* is also consistent with *City & Co. of S. F. v. Market St. Ry. Co.* (1937) 9 Cal.2d 743 (*City & Co. of S. F.*), on which plaintiffs rely in their reply brief.[44] Indeed, *Jacks* cites *City & Co. of S. F.* for the proposition that "a franchise fee is the purchase price of the franchise." (*Jacks*, *supra*, 3 Cal.5th at p. 262, citing *City & Co. of S. F.*, *supra*, 9 Cal.2d at p. 749.)

_____

[44] Plaintiffs contend *City & Co. of S. F.* reveals "[t]he invalidity of the City's position."

41

In *City & Co. of S. F.*, a municipality brought an action against a railway company to collect a municipal "license tax" on street cars operated by the railway company. (*City & Co. of S. F.*, *supra*, 9 Cal.2d at p. 744.) The railway company contended that the municipal taxes were invalid pursuant to a state constitutional provision that established a tax on the percentage of gross receipts from railway companies and provided that such tax would be " 'in lieu of all other taxes and licenses . . . .' " (*Ibid.*) The municipality, in turn, maintained that the municipal license tax was lawful because the "orders and ordinances by which it granted franchises provid[ed] either for a 'license' or 'license tax' in the sum of $15 per car per annum," (*id.* at p. 747) and the state constitutional provision contained a proviso requiring a company to pay " 'any amount agreed to be paid or required by law to be paid for any special privilege or franchise granted by any of the municipal authorities of this state.' " (*Id.* at p. 744.) The *City & Co. of S. F.* court quoted the relevant constitutional provision as follows:

> " 'Such taxes shall be *in lieu of all other taxes and licenses*, state, county and municipal, upon the property above enumerated [operative property] of such companies except as otherwise in this section provided; *provided*, that nothing herein shall be construed to release any such company from the payment of any amount agreed to be paid or required by law to be paid for any special privilege or franchise granted by any of the municipal authorities of this state.' " (*Ibid.*, italics added.)

The *City & Co. of S. F.* court considered whether the charge was a *license tax* subject to the preemptive clause of the constitutional provision or instead, a *franchise payment* subject to the proviso contained therein. (See *City & Co. of S. F.*, *supra*, 9 Cal.2d at p. 745 ["The question involved on this appeal is whether the 'license tax' . . .

42

is an amount 'agreed to be paid or required by law to be paid' for the franchises under which the defendant operates its cars"].)  In determining that the charge was a prohibited license tax, the *City & Co. of S. F.* court stated, "There is a clear distinction between the amount agreed to be paid for property, or required by law to be paid for it, that is, the purchase price, and taxes thereafter levied upon it or exacted of the owner in respect of said property."  (*Id.* at p. 749.)  In reaching this conclusion, the *City & Co. of S. F.* court emphasized that the license tax at issue in the case arose from a source *independent* of the franchise agreement.  (*Id.* at p. 748 ["even in the absence of provision for a tax or license in the grant of franchise . . . the grantee, in the absence of express exemption from taxation in the grant, is subject to taxes in respect of this species of property, as of other types of property"].)  Thus, the *City & Co. of S. F.* court concluded that the license taxes were not "amounts 'agreed to be paid or required by law to be paid *for*' the franchises, within the proviso of [the state] Constitution, preserving to municipalities the right to collect such amounts."  (*Id.* at p. 750.)

While the *City & Co. of S. F.* court concluded that the license taxes in that case did not arise from the franchise agreements in which they were referenced, the court concluded that the essence of franchise compensation under the state constitutional provision at issue was whether the charge at issue was an amount paid "*for"* the franchise rights.  (*City & Co. of S. F.*, *supra*, 9 Cal.2d at p. 750, italics added; see *Jacks*, *supra*, 3 Cal.5th at p. 257 [describing a franchise fee as "a charge imposed in exchange *for* franchise rights" (italics added)].)

43

In sum, *Jacks* and the case law on which it is premised, establish that any "charge imposed in *exchange for* franchise rights," (*Jacks*, *supra*, 3 Cal.5th at p. 257, italics added) constitutes franchise compensation, provided that the amount of the charge bears a reasonable relationship to the value of the franchise rights.  (*Ibid.*)  We therefore reject plaintiffs' suggestion that certain charges, namely, those that serve as "consideration to induce" the granting of a franchise, are exempt from *Jacks*'s rationale.  In the following sections, we apply this understanding of *Jacks* in considering each of plaintiffs' specific arguments as to text, legislative history, application and purpose in concluding that the Undergrounding Surcharge amounts to franchise compensation and is therefore not subject to Proposition 218's voter approval requirements under *Jacks*.

> b. *The text of the Electric Franchise supports the conclusion that the Undergrounding Surcharge is compensation for franchise rights under* Jacks

Section 9(b) of the Electric Franchise contains the Undergrounding Surcharge and provides for a 3.53 percent surcharge to be imposed on ratepayers' bills.  (See pt. II.A.5.c, *ante*.)  As a monetary obligation to be paid by ratepayers, we agree with plaintiffs that the surcharge may reasonably be considered a "charge" *potentially* subject to voter approval under Proposition 218.  (See *Jacks*, *supra*, 3 Cal.5th at p. 257 ["Whether the surcharge required voter approval hinges on whether it is a valid charge under the principles that exclude certain charges from voter approval requirements"].)

As noted in part II.A.5.c, *ante*, the recitals to the 2002 Electric Franchise Amendment provided that the "[p]arties have agreed that the funding for the obligations," imposed by the amendment would come, in part, from the Undergrounding Surcharge.

44

Further, the 2002 Electric Franchise Amendment specifically mandated that SDG&E would apply to the PUC to budget amounts funded in part by the Undergrounding Surcharge.[45] (Ord. O-19030, § 3.) In addition, section 9(e) of the Electric Franchise expressly provides, "This section is intended only to be a measure of *a portion of the consideration to be paid by Grantee to City* for the rights and privileges granted herein . . . ." (Italics added.) Moreover, section 12 of the Electric Franchise provides, "This franchise is granted upon each and every condition herein contained, and shall ever be strictly construed against Grantee."[46]

Thus, the text of the Electric Franchise supports the conclusion that the Undergrounding Surcharge was *consideration* given by SDG&E in exchange for franchise rights. In other words, unlike the license tax at issue in *City & Co. of S. F.*, *supra*, 9 Cal.2d at page 748, the text of the Electric Franchise supports the conclusion that the Undergrounding Surcharge was not *unilaterally* imposed by the City pursuant to its

---

[45] For an explanation of the PUC's involvement in the approval of this type of surcharge see footnote 6, *ante*.

[46] Section 16 of the 2001 MOU also made clear that SDG&E's agreement to the Undergrounding Surcharge was part of the consideration given to the City for the franchise in that it specified that, if the surcharge were not approved by the PUC, the City and SDG&E would continue to negotiate the terms of the amendment of the Electric Franchise or submit the matter to arbitration. Thus, section 16 of the 2001 MOU also makes clear that the City did not *unilaterally* impose the Undergrounding Surcharge, and that the surcharge was based on an *agreement* between the City and SDG&E.

taxing powers *independent* of the Electric Franchise.[47]  Further, since, we have concluded in part III.D.1.a, *ante*, that all consideration that is a "charge" and is given in exchange for franchise rights constitutes "compensation for the use of government property" as that phrase is used in *Jacks*, *supra*, 3 Cal.5th at page 254, the text of the Electric Franchise supports the conclusion that the Undergrounding Surcharge is compensation given for the use of government property under *Jacks*.

Plaintiffs' textual arguments are primarily based on their contention that "the City made a clear distinction between general *consideration* for the City granting the franchise and *compensation* (i.e. recompense) for use of its streets."  For example, plaintiffs point out that section 4 of the Electric Franchise refers to the 3 percent payment obligation as "compensation,"[48] while section 9, which contains the Undergrounding Surcharge, does not use the term "compensation."  Plaintiffs also note that the recitals to Ordinance O-19030 refer to the 3 percent payment obligation as the "franchise fee."  In explaining the purported significance of the use of such terms, plaintiffs return to their central argument that not all *consideration* given in exchange for a franchise is *compensation* for franchise rights under *Jacks*.

---

[47]     Stated differently, it is plain from the text of the Electric Franchise that SDG&E could not refuse to comply with its obligations pertaining to undergrounding and still maintain its electric franchise.

[48]     Plaintiffs also contend that the reason that the City used the term "compensation" in Electric Franchise, sections 4 and 5 was to comply with sections of the City Charter specifying certain requirements for franchise agreements entered into by the City (City of San Diego Charter, §§ 104, 105).

We reject this argument for two fundamental reasons. First, for the reasons explained above, we conclude that *Jacks* drew no distinction between monetary *consideration* given to induce the granting of a franchise and *compensation* given for a franchise for purposes of determining the applicability of voter approval requirements of Proposition 218.

Second, plaintiffs' textual argument is premised on the notion that the *City* anticipated the distinction, which we have rejected, between compensation and consideration that plaintiffs glean from *Jacks*, and intended for *only* the 3 percent payment obligation to constitute franchise compensation.[49] As plaintiffs argue, "the language of the ordinances makes it clear that the *City did not intend* all franchise consideration, including the surcharge, to be compensation for use of City streets." (Italics altered.) We are not persuaded that the City anticipated the distinction that plaintiffs draw from *Jacks*—a decision issued more than a decade after the adoption of the 2002 Electric Franchise Amendment and that draws no distinction between *compensation* and *consideration*—and elected to use language in describing the Undergrounding Surcharge that would subject the surcharge to the voter approval requirements of Proposition 218. It is far more plausible that, consistent with our

---

[49] Plaintiffs note that the ordinance at issue in *Jacks did* refer to the surcharge at issue in that case as "compensation," and argue, that if the City had intended for "SDG&E's undergrounding agreement," in section 9 of the Electric Franchise to constitute compensation, the City would have specified that SDG&E's obligations were given "as *compensation* for the use of the streets of the City." (Boldface omitted; italics added.)

47

conclusion in part III.D.1.a, *ante*, the City simply did not perceive there to be any significant difference between the terms *compensation* and *consideration* in this context. This conclusion is supported by the fact that section 4 of the Electric Franchise, which describes the 3 percent payment obligation as "*compensation*" (Electric Franchise, § 4(b), italics added) is itself titled "*CONSIDERATION*." (Italics added.)

In any event, we are not bound by the label that the City and SDG&E ascribed to the Undergrounding Surcharge. (Cf. *Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 381 [noting that Proposition 218 was adopted because "local governments were able to increase rates for services by labeling them fees, charges, or assessments rather than taxes"]; accord *Jacks*, *supra*, 3 Cal.5th at p. 271 [considering whether a charge that is "nominally a franchise fee," in reality "constitutes a tax"]; see also *id.* at p. 280 ["In determining whether a charge is a tax, courts 'are not bound by what the parties may have called the liability' [citation]" (dis. opn. of Chin, J.)]. While the City and SDG&E may not have foreseen that a surcharge that a utility agreed to collect from its ratepayers (i.e., one that was not paid directly out of the utility's own assets), was a franchise fee *prior* to *Jacks*, our task is to examine whether the characteristics of the Undergrounding Surcharge meet the test for franchise compensation under *Jacks*. For the reasons discussed throughout this opinion, we conclude that the Undergrounding Surcharge meets that test.

Finally, we reject plaintiffs' argument that because SDG&E did not agree to "*pay* the surcharge to the City*,*" "the language in [Ordinance] 10466, section 9[50] relied upon by the trial court is not applicable to the surcharge at all."  (Boldface omitted.)  In making this argument, plaintiffs contend that SDG&E acts only as "the City's collection agent," because ratepayers, rather than SDG&E, *pay* the surcharge.  The same was true in *Jacks*, and the Supreme Court squarely rejected the notion that this fact demonstrated that the surcharge was not a franchise fee.  The *Jacks* court stated that it would place "form over substance," to attribute significance to the fact that a utility surcharge is placed directly on ratepayers' bills, rather than being paid by the utility itself when determining whether a surcharge is a tax.  (*Jacks*, *supra*, 3 Cal.5th at p. 269.)  The *Jacks* court reasoned that this was so because a "publicly regulated utility is a conduit through which government charges are ultimately imposed on ratepayers."  (*Ibid.*)  Plaintiffs offer no basis for distinguishing *Jacks* with respect to this issue.  Thus, we reject plaintiffs' argument that the Undergrounding Surcharge does not constitute compensation for the franchise because SDG&E does not *pay* the surcharge.

---

50     The language to which plaintiffs refer provides, "This section is intended only to be a measure of a portion of the consideration to be paid by Grantee to City for the rights and privileges granted herein . . . ."  (Ord. 10466, § 9(e).)  This language remained in the Electric Franchise after the 2002 Electric Franchise Amendment.

c. *Plaintiffs fail to identify any legislative history of the Electric Franchise that supports the conclusion that the Undergrounding Surcharge is not compensation for franchise rights under* Jacks

Plaintiffs contend that the legislative history of the Electric Franchise demonstrates that the Undergrounding Surcharge is not franchise compensation under *Jacks*. Plaintiffs raise two arguments in support of this claim. Neither is persuasive. First, plaintiffs note that, in 1970, together with the Electric Franchise, the City entered into a *gas* franchise with SDG&E, and that the City and SDG&E amended both franchises in 2002. Plaintiffs observe that both the gas and electric franchise agreements included provisions mandating payment of 3 percent of gross receipts for compensation for the use of the City's streets, but that the "City imposed the [Undergrounding Surcharge] *only* upon *electricity* customers." (Italics added.) Plaintiffs claim that this disparity demonstrates that the Undergrounding Surcharge was a "revenue stream for [the City's] expansive undergrounding program," and did not "compensate the City for using its streets."

To the extent that plaintiffs intend to argue that the City was obligated to agree to the same compensation for the two franchises, but *failed* to do so, this argument is unpersuasive because plaintiffs have not established that the gas and electric franchises are equally valuable. Thus, the fact that the City charged more for the use of its streets for the Electric Franchise does not establish that the higher price was, in part, a disguised tax. To the extent that plaintiffs intend to argue that the City agreed to receive the *same* compensation for the two franchises, but imposed a utility tax solely on the electric franchise, this argument amounts to nothing more than the contention that we rejected

50

above, i.e., that the Undergrounding Surcharge did *not* constitute compensation for the use of the City's streets under *Jacks*. We reject it here for the same reasons.

Plaintiffs also contend that the fact that the 3 percent payment obligation is referred to as a "franchise fee" at various places in the documents that comprise the legislative history of the 2002 Electric Franchise Amendment,[51] demonstrates that the 3 percent payment obligation is "the *sole* compensation for use of City streets." This argument, too, is nearly identical to the argument that plaintiffs make with respect to the purported significance of the use of the term "compensation" in section 4 of the Electric Franchise. Yet, whether contained in the text of the Electric Franchise or in its legislative history, we conclude that references to the 3 percent payment obligation as a "franchise fee" or as "compensation," does not demonstrate that the Undergrounding Surcharge is not "a charge imposed in exchange for franchise rights" under *Jacks*, *supra*, 3 Cal.5th at page 257.[52]

―――――――――――――

[51] Specifically, plaintiffs note that the 3 percent payment obligation is referred to as a "franchise fee" in various enactments (e.g., the resolutions extending negotiations that led to the 2002 Franchise Amendment, the 2001 MOU, a December 2001 City Manager's report recommending adoption of the 2002 Franchise Amendment, and the minutes of the January 2002 City Council meeting adopting the 2002 Franchise Amendment).

As noted in footnote 27, *ante*, the trial court sustained the City's objections to the plaintiffs' introduction of the City Manager's report and the City Council's minutes. The plaintiffs challenge the trial court's ruling sustaining these objections on appeal. For the reasons stated in the text, we conclude that, even assuming that the trial court erred in sustaining the City's evidentiary objections to these documents, none of the legislative history demonstrates that the Undergrounding Surcharge is a tax.

[52] In their reply brief, plaintiffs cite a case, *County of Alameda v. Pacific Gas & Electric Co*. (1997) 51 Cal.App.4th 1691, decided *prior* to *Jacks* and contend, "With respect to the term 'franchise fee,' courts have concluded that a fee paid to a municipality

d. *Plaintiffs' contention that the City's application of the Electric Franchise demonstrates that the Undergrounding Surcharge is not franchise compensation under* Jacks *is without merit*

Plaintiffs note that City Charter section 103.1A mandates that the City place "25 percent of all moneys derived from the revenues accruing to the City from any franchises for the transmission and distribution of gas, electricity and steam within the City of San Diego," into a fund called the Environmental Growth Fund. Plaintiffs further note that, while the City places 25 percent of the funds that it receives from SDG&E's payment of the 3 percent payment obligation into the Environmental Growth Fund, the City has never placed revenue from the Undergrounding Surcharge into this fund. Plaintiffs contend that this course of conduct demonstrates that the City has "never intended or considered the [U]ndergrounding [S]urcharge to be revenue accruing . . . from any franchise fee."

We are not persuaded. Plaintiffs' argument implicitly rests on the premise that the meaning of "moneys derived from the revenues accruing to the City from any franchises for the transmission and distribution of . . . electricity . . . within the City of San Diego," (City Charter, § 103.1A) has the same meaning as "a charge imposed in exchange for franchise rights" under *Jacks*. (*Jacks*, *supra*, 3 Cal.5th at p. 257.) Yet, plaintiffs present

---

*as a percentage of gross receipts* to use/lease public property (i.e. the 3% fee) is a franchise fee." (Italics added.) Even assuming that, prior to *Jacks*, the term franchise fee ordinarily connoted a fee paid as a percentage of a utility's gross receipts, that is clearly not the case in the wake of *Jacks*, since in *Jacks*, the Supreme Court concluded that a surcharge imposed directly on ratepayers was a franchise fee, so long as it bore a reasonable relationship to the franchise rights conveyed to the utility. (*Jacks*, *supra*, 3 Cal.5th at p. 257.) Thus, plaintiffs' heavy reliance on the fact that the ordinance and its legislative history refer to the 3 percent payment obligation as a "franchise fee" or as "compensation," does not demonstrate that the Undergrounding Surcharge is not a franchise fee.

52

no argument as to why terms in the City Charter should be interpreted identically with concepts from a Supreme Court decision.

Even when interpreting the meaning of two legislative acts, "statutes should be construed together only if they stand in pari materia." (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124.) " 'Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person or things, or have the same purpose or object. Characterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other. *It has been held that where the same subject is treated in several acts having different objects the statutes are not in pari materia.* "The adventitious occurrence of . . . similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule." ' " (*Ibid.*, italics added.)

The City Charter provision establishing the Environmental Growth Fund does not serve the same object as does the test for franchise compensation in *Jacks*. (Compare City Charter section 103.1A ["The Environmental Growth Fund shall be used exclusively for the purpose of preserving and enhancing the environment of the City of San Diego in whatever manner is deemed appropriate by the City Council of The City of San Diego"] with *Jacks*, *supra*, 3 Cal.5th at p. 257 ["Whether the surcharge required voter approval hinges on whether it is a valid charge under the principles that exclude certain charges from voter approval requirements"].) Thus, there is no reason to conclude that the meaning of franchise compensation for purposes of the Environmental Growth Fund

would be identical to the meaning of that term as used in *Jacks.* A court might conclude that revenue, such as the Undergrounding Surcharge, that is dedicated for a specific use by way of a franchise agreement is *not* subject to allocation into the Environmental Growth Fund for purposes of the City Charter,[53] even though such revenue is compensation under *Jacks.* Simply put, there is no necessary interpretative connection between the two.

Moreover, even assuming that the City *improperly* failed to deposit the Undergrounding Surcharge revenue into the Environmental Growth Fund, such error might well have resulted from inadvertence, negligence, or even malfeasance that was entirely distinct and unrelated to the City's determination of whether the Undergrounding Surcharge constitutes a charge for franchise rights under *Jacks.*[54] Plaintiffs point to no evidence demonstrating that the City elected not to deposit the Undergrounding Surcharge revenues into the Environmental Growth Fund *because* the City believed that such revenues were not franchise compensation under *Jacks.*

Accordingly, we reject plaintiffs' argument that the City's failure to deposit revenues from the Undergrounding Surcharge into the Environmental Growth Fund demonstrates that the surcharge is a tax rather than franchise compensation under *Jacks.*

---

[53]    This question is not before this court and we therefore express no opinion with respect to whether this would be a proper interpretation and application of the City Charter.

[54]    We emphasize that we do not conclude that the City improperly failed to allocate Underground Surcharge funds to the Environmental Growth Fund.

e. *Plaintiffs' contention that the Undergrounding Surcharge lacks the characteristics of a franchise fee is without merit*

Plaintiffs note that in *Jacks*, the Supreme Court identified the following characteristics of a franchise fee:

> "[A] fee paid for an interest in government property is compensation for the use or purchase of a government *asset* rather than compensation for a cost. Consequently, the revenue generated by the fee is available for whatever purposes the government chooses rather than tied to a public cost." (*Jacks*, *supra*, 3 Cal.5th at p. 268.)

Plaintiffs contend that the Undergrounding Surcharge lacks these attributes because the surcharge may be used only for undergrounding and, according to plaintiffs, the surcharge is "unrelated to the use of any City asset."

The latter argument amounts to nothing more than an assertion that the Undergrounding Surcharge is not compensation for the use of the City's streets. We reject that argument, because, as described in part III.D.1.b, *ante*, the text of the Electric Franchise supports the conclusion that the Undergrounding Surcharge is part of the compensation that SDG&E paid for the use of the City's streets.

As to the former argument, there is nothing in *Jacks* that precludes a government from entering into an agreement that governs its use of franchise fee payments. In fact, the agreement at issue in *Jacks*, "provided that half of the revenues generated by the surcharge were to be allocated to the City's general fund and half to a City undergrounding projects fund." (*Jacks*, *supra*, 3 Cal.5th at p. 256.)[55] Nevertheless, the

---

[55] The *Jacks* court stated that the municipality later decided to allocate *all* of the revenues generated by the surcharge to its general fund. (*Jacks*, *supra*, 3 Cal.5th at

*Jacks* court concluded that the surcharge at issue in that case was a valid franchise fee as long as it did not exceed the reasonable value of the franchise. (*Id.* at p. 254.)

In addition, in *Jacks*, in specifying that franchise fees are "available for whatever purposes the government chooses," the Supreme Court was merely clarifying that franchise fees, unlike other fees, are not limited to the *costs* of providing a service or benefit (as with special assessments) or offsetting the impact of the payee's activities (as with development and regulatory fees). (*Jacks*, *supra*, 3 Cal.5th at p. 268 [stating that, with respect to franchise fees, "the revenue generated by the fee is available for whatever purposes the government chooses rather than tied to a public cost"].) However, there is nothing in *Jacks* that suggests that a government's agreement in a franchise agreement to use franchise fees in a specified manner demonstrates that such fees are taxes.

Plaintiffs have not advanced any reason why a limitation on the use of surcharge funds for undergrounding would support the conclusion that the surcharge is a tax. On the contrary, if anything, the fact that the City agreed with SDG&E to use the Undergrounding Surcharge revenues for undergrounding supports the conclusion that the surcharge is not a *tax*. That is because, as the *Jacks* court recognized, an essential attribute of a taxation is that " 'no compensation is given to the taxpayer except by way of governmental protection and other general benefits.' " (*Jacks*, *supra*, 3 Cal.5th at p. 268, quoting 9 Witkin, Summary of Cal. Law (10th ed. 2005) Taxation, § 1, p. 25].) The City's promise to SDG&E to use the Undergrounding Surcharge funds for

---

p. 256.) The *Jacks* court did not discuss the authority pursuant to which the municipality authorized such a reallocation.

56

undergrounding supports the conclusion that SDG&E received something other than

" 'general benefits,' " in exchange for agreeing to the surcharge. (*Ibid.*)

###### f. *Conclusion*

In *Jacks*, the California Supreme Court rejected the argument that a utility surcharge contained in a franchise agreement to be paid directly by ratepayers, rather than the utility itself, was a tax rather than a franchise fee. (*Jacks*, *supra*, 3 Cal.5th at p. 257.) The *Jacks* court reasoned that this was so because a charge imposed in *exchange* for franchise rights is not a tax ([*ibid.*]),[56] and that to conclude otherwise merely because ratepayers paid the charge would be to place "form over substance." (*Id.* at p. 269.)

As with the surcharge in *Jacks*, the Undergrounding Surcharge in this case is a charge imposed in *exchange* for franchise rights. While plaintiffs attempt to draw a distinction between consideration and compensation in this context, that purported distinction amounts to nothing more than an argument that places "form over substance" (*Jacks*, *supra*, 3 Cal.5th at p. 269) and is inconsistent with the central teaching of *Jacks*. Accordingly, we conclude that the Undergrounding Surcharge constitutes compensation in exchange for franchise rights under *Jacks*.

---

[56]   This is the case as long as the charge is reasonably related to the value of the franchise rights. (*Jacks*, *supra*, 3 Cal.5th at p. 257.)

2. *The City demonstrated that the compensation that it receives from the Undergrounding Surcharge bears a reasonable relationship to the value of the franchise rights under* Jacks

Plaintiffs contend that "the surcharge has no relationship to the value of the use of City streets." (Boldface & some capitalization omitted.) Plaintiffs offer several arguments in support of this claim, but none has merit.[57]

First, plaintiffs contend that "[i]f the surcharge is not compensation for the use of City streets and is unrelated to that property right, it cannot have *any* relationship to the value of those rights." (Italics altered.) We concluded in part III.D.1, *ante*, that the Undergrounding Surcharge constitutes compensation in exchange for franchise rights under *Jacks*. Accordingly, we reject plaintiffs' contention that the surcharge does not have *any* relationship to the value of the Electric Franchise rights.

Plaintiffs also maintain that the City failed to carry its "burden of proof" to establish that the value of the surcharge reasonably relates to the value of the franchise rights. Specifically, plaintiffs contend that the City failed to present a "valuation analysis" of the franchise rights, and that the City's evidence as to the negotiations leading to the adoption of the 2002 Electric Franchise Amendment did not demonstrate that the negotiations were "bona fide." We are unpersuaded.

---

[57] As noted in part II.B.6, *ante*, plaintiffs' opposition to the City's motion for summary judgment did not address the reasonable value prong of *Jacks* other than to assert that the City had "offered no evidence" on this issue. Notwithstanding any possible forfeiture, we address all of the plaintiffs' arguments on appeal with respect to this issue and conclude that they are meritless.

The City was not required to present a "valuation analysis," under *Jacks*, and thus, the absence of such an analysis does not demonstrate that the City failed to carry its burden of proof. The *Jacks* court said that a municipality could establish the value of a franchise through "bona fide negotiations." (*Jacks*, *supra*, 3 Cal.5th at p. 270.) The City offered extensive and undisputed evidence concerning the negotiations surrounding both the 1970 Electric Franchise and the 2002 Electric Franchise Amendment. (See pt. II.A.3.a and pt. II.A.5.a, *ante*.) In particular, with respect to the negotiations pertaining to the amendment, as described in part II.A.5.a, *ante*, the City hired consultants to advise it with respect to the amendment and the City received a memorandum from the consultants concerning issues that were likely to arise in the negotiations. City representatives also met with SDG&E representatives more than 30 times during a multi-year negotiating process. The City and SDG&E exchanged offers as well as numerous draft ordinances and agreements during the process, before agreeing to the 2001 MOU and the 2002 Electric Franchise Amendment. Plaintiffs, in turn, offered no evidence in opposing the City's motion for summary judgment in the trial court suggesting that such negotiations were not undertaken in good faith.[58]

---

58    (Compare with *Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73, 90, review granted Aug. 12, 2020, S262634 [concluding that plaintiffs properly stated a cause of action sufficient to withstand *demurrer* where they *alleged* that franchise fee did not reflect the value of the franchise in part because the "procurement process was mishandled and subject to political considerations"].) While *Zolly* involved whether the plaintiffs had adequately *alleged* that a franchise fee was "not reasonably related to the value received from the government" (*id.* at p. 89), the summary judgment in this case was granted based on undisputed *evidence* demonstrating that the compensation that the

Instead, plaintiffs offer several arguments on appeal in support of their contention that the City failed to establish the existence of "bona fide negotiations," under *Jacks*. First, plaintiffs *assert* that the negotiations were "primarily about the [3 percent payment obligation] for the remaining 20 years of the franchise – not the surcharge." Yet, plaintiffs cite no *evidence* establishing that this is so. In fact, the record contains ample undisputed evidence that the City and SDG&E engaged in extensive negotiations pertaining to undergrounding that culminated in the Undergrounding Surcharge. Specifically, the City presented undisputed evidence that: the City's consultants advised it with respect to undergrounding; the City requested that SDG&E's undergrounding obligation be altered to mandate the *spending* of funds rather than the *allocation* of funds; SDG&E offered to increase spending on undergrounding projects in exchange for a reduction of its 3 percent payment obligation; and the City participated in PUC proceedings pertaining to undergrounding that impacted its bargaining position vis-à-vis the negotiations with SDG&E.

Plaintiffs also assert that "where a utility merely collects a surcharge from its customers and remits the revenue to a city, the utility has no reason to engage in bona fide negotiations." This argument is contrary to both common sense and *Jacks*. As is true for any business, a utility plainly has an incentive to minimize the total amount of

_____

City receives from the Undergrounding Surcharge bears a reasonable relationship to the value of the franchise rights under *Jacks*.

      *Zolly* was decided after the parties completed their briefing in this case. Plaintiffs properly alerted us to the decision via a letter filed pursuant to California Rules of Court, rule 8.254.

money that its customers will be required to pay in exchange for its goods and services in order to maintain the goodwill of its customers. Indeed, the City presented evidence that SDG&E's representatives considered the public's perception of a potential increase in the surcharge during the negotiations.[59] Further, while plaintiffs suggest that *Jacks* supports the proposition that a utility has "no incentive to negotiate a lower undergrounding surcharge because the surcharge is a pass-through charge," (boldface & italics omitted) in fact, *Jacks* supports the opposite proposition. In *Jacks*, as in this case, the surcharge at issue was to be paid directly by the utility's customers (*Jacks*, *supra*, 3 Cal.5th at p. 271), yet the *Jacks* court stated that a governmental agency, such as the City, could look to "bona fide negotiations . . . to establish a reasonable value of franchise rights." (*Id.* at p. 270.)

Finally, plaintiffs argue that the "evidence proves the surcharge is not related to the value of SDG&E's right to use City streets." (Boldface & italics omitted.) In support of this contention, plaintiffs return to their argument that an Undergrounding Surcharge is not imposed on the gas franchise "despite the nearly identical property interests." Plaintiffs also argue that the fact that the franchise fees that SDG&E pays to other jurisdictions in SDG&E's service territory is less than the franchise fees that it pays to the

---

59    Specifically, the City lodged an internal memorandum from SDG&E's representatives who negotiated the 2002 Electric Franchise Amendment that stated, in relevant part, "Public perception appears to be that this is a SDG&E rate increase instead of a surcharge imposed by the City."

City demonstrates that the surcharge is not compensation for the use of the City's streets. Neither argument is persuasive.

With respect to the gas franchise, as we concluded above, plaintiffs point to no evidence that the property interests conveyed in the gas and electric franchises are comparable. (See pt. III.D.1.c, *ante*.) With respect to other jurisdictions' franchise fees, *Jacks* makes clear that the market price of utility franchises in charter cities is distinct from that in general law cities. (See fn. 6, *ante*.) Plaintiffs failed to demonstrate that the differences in franchise fees within SDG&E's service area are not due to such market differences.

Accordingly, we conclude that plaintiffs have not demonstrated that the trial court erred in concluding that the compensation that the City receives from the Undergrounding Surcharge bears a reasonable relationship to the value of the franchise rights.

IV.

DISPOSITION

The judgment is affirmed. The City is entitled to recover costs on appeal.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

GUERRERO, J.

62